# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 1, 2005

## STATE OF TENNESSEE v. LORETTA A . WRIGHT

**Direct Appeal from the Circuit Court for Williamson County**
**No. I-039-203      Russ Heldman, Judge**

---

**No. M2004-00802-CCA-R3-CD - Filed April 7, 2005**

---

A Williamson County Grand Jury indicted the Defendant, Loretta A. Wright, for one count of misdemeanor child abuse. The Defendant pled guilty, and the trial court sentenced the Defendant to serve eleven months and twenty-nine days. On appeal, the Defendant contends that the trial court's sentence is excessive. After thoroughly reviewing the record and the applicable authorities, we affirm the Defendant's sentence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Tracey Robinson-Coffee, Nashville, Tennessee, for the Appellant, Loretta Wright.

Paul G. Summers, Attorney General and Reporter; Michael Markham, Assistant Attorney General; Ronald L. Davis, District Attorney General; and Mary Katharine White, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the Defendant's conviction for misdemeanor child abuse, a crime to which the Defendant pled guilty. The Defendant appeals her sentence and the following evidence was presented at the her sentencing hearing: Marlene Baugh, an investigator with the Department of Children's Services ("DCS"), testified that she has worked at DCS for over three years. She said that she received a call from the Williamson County Sheriff's office about allegations of child abuse at the Defendant's residence, and she went to the Defendant's residence on November 17, 2002, where she discovered the Defendant lived with four children. She testified that three of the children were the Defendant's grandchildren and one child was the Defendant's great-grandchild. Baugh

testified that the victim, the Defendant's great-grandchild, B.C.[1], was eight years old. Baugh interviewed the victim, the other children, and the Defendant, and she discovered that the victim had bruises and injuries, that were in various stages of healing, on her legs and arms. Baugh said she thought the injuries were the result of repeated whippings from a switch that the child had received on several occasions. She explained that the victim stated that the injuries occurred when the Defendant whipped her on at least three different days. Baugh stated that the victim said that she was whipped because she wet the bed, and the victim had to wear long pants and sleeves to cover the injuries on her arms and legs. She observed the switch that the Defendant used on the victim, and it was "a very thin limb off of a tree."

Baugh testified that all of the children were very nervous when she arrived, most likely because the police were also present, but she found them eager and somewhat excited to talk with her when they were alone. She testified that she spoke with two of the other children, Lucy and Portia, who were 11 and 13, and the fourth child, an infant, was too young to be interviewed. She testified that Lucy stated that she had witnessed her grandmother hitting the victim with a switch multiple times on November 17. She said that Lucy called the police on that day because she was afraid that her grandmother's beatings of the victim would cause serious injuries. Baugh testified that Lucy told her that she had asked her grandmother to stop, and she was upset about what had happened to B.C. She said that Lucy indicated that B.C.'s injuries occurred between one and three times per week. Baugh testified that all of the children told her that the victim was beaten every time she wet the bed, which was at least every other day.

Baugh said that she spoke with the Defendant on the evening of the offense, and the Defendant told her that she had whipped the victim for wetting the bed. She testified that the Defendant appeared upset, but she did not think that she had done anything wrong. Baugh stated that the Defendant said that she might have spanked the victim excessively, and the Defendant stated that she felt bad about her actions. She testified that she did not believe that the Defendant understood the health risks of her actions, and she told the Defendant that the victim may have a medical condition if the victim wet the bed excessively.

Baugh also interviewed the victim, who told her that she loved her grandmother, but she wanted the beatings to stop, and she felt that her sisters did not get the same discipline that she did. The victim said that she felt that she was the least favorite, and she did not understand why. She said that a custody hearing was scheduled for the next day, because the Defendant was seeking custody of the victim and Lucy, and, therefore, Baugh set up a safety plan with the Defendant for that evening. She testified that she presented the case to the juvenile court the next morning, the court granted the State custody of the victim and Lucy, and the two children were removed from the residence. She explained that a different court had previously granted the Defendant custody of Portia and the infant.

---

[1] It is our policy to refer to minor victims of abuse by their initials.

On cross-examination, Baugh stated that she also spoke with the victim, a few months after the incident, and, at that time, the children seemed happy, and they were waiting to go home with their father to Mississippi. Baugh testified that the Defendant stated that she had whipped the victim on more than one occasion and that this form of discipline was common for the victim. She said that the Defendant showed some remorse for hurting the victim. On redirect-examination, Baugh testified that the Defendant did not see anything wrong with this type of discipline.

Grace Battle testified that she is the Defendant's sister, and she has lived next door to the Defendant for about ten years. She said that the Defendant has had foster children since 1993, and the police had never been called to the Defendant's residence for a reported child abuse prior to this incident. She testified that she and the Defendant were involved in the same foster care program, and she never heard that the Defendant abused any children. Battle testified that she did not see the Defendant spank or whip her grandchildren. She explained that the Defendant had a good relationship with her grandchildren, and the Defendant took them places, loved them, fed them, and gave them a home. Battle said that she would have no concerns about the Defendant caring for her own grandchildren. On cross-examination, Battle said that the Defendant had five or six foster children between 1993 and 1998. She said that she was not there on the day the police were called, and she did not see the bruises on the victim.

Cleo Gordon, a probation officer with Metro Juvenile Court, testified that he met the Defendant in 2000 when he was doing part-time work for an agency that provides services for foster children. He said that he went to the Defendant's home because he was a therapeutic mentor and worked for almost a year with the Defendant and a foster child she had at the time. He recalled that, during that time, the Defendant may have had two or three children placed in her home for emergency services. He testified that, with respect to the child that he worked with, the Defendant was a very involved foster parent, and she would take the child to school and to the doctor as needed. Gordon testified that he had no reason to believe that the Defendant abused children, and the child that he worked with never mentioned that the Defendant injured him. On cross-examination, Gordon testified that the victim's injuries would not be consistent with a foster parent who had received training in disciplining a minor child or dealing with a bed-wetting situation. He agreed that the victim would have potential emotional problems because she was beaten for something she could not control, and her siblings were not treated in the same way.

Larry Smith testified that he is the Defendant's pastor, and she attends his church on a regular basis. He said that she is a trustee on his board and the assistant superintendent of sunday school. He testified that he had no complaints from any parishioner about the Defendant disciplining any children. Smith testified that the Defendant is honest and hardworking, and she was raised in an "old school" method where they disciplined children differently, but it was "not with any kind of malicious intent, [but rather] out of love." He said that he did not see the pictures of the child's injuries, but he has no concerns about the Defendant being around young children. Smith testified that, as the Defendant's pastor, he could assist her by counseling and ministering.

The Defendant testified that she has been a foster parent for about fifteen years, and in November of 2002 she was caring for three grandchildren and one great-grandchild. She testified that in 1998, the victim, Lucy, Portia, and two other children came to live with her, and they were there for two years. She said that they returned to Michigan to live with their mother and then came back to live with her. The Defendant testified that she had a good relationship with the victim, and the victim called her "momma." She said that she whipped the victim because, when the victim returned from Michigan, she was wetting the bed. She testified that she told the victim that she could not drink a lot of liquid before bed, but, the morning of this incident, the Defendant discovered soda cans under the victim's bed. The Defendant testified that she told the victim that she was going to whip her, and she did so with a switch. She said that she whipped the victim only one time and that she did not whip the victim two or three times a week because the victim was not there as she had just returned from Michigan. She testified that she whipped the victim on the outside of the victim's pants, but not all over her body. The Defendant testified that she did not know if the marks on the victim were possibly from before the victim arrived to live with her. She said that she was sorry that she whipped the victim, and she was sorry about the injury that the victim sustained. The Defendant testified that neither the police nor DCS had ever been called about her grandchildren or any foster children. On cross-examination, the Defendant testified that she was surprised by the marks on the victim because she "did not whip her legs, her back, her arms. [She] whipped her behind with pants on." She said that she probably struck the victim more than five times but less than ten times.

Prior to sentencing the Defendant, the trial court stated:

> By pleading guilty to [child abuse], it's deemed that there's been an infliction of injury or a neglect so as to adversely affect the child's health and welfare, period. And it wasn't an accident and [the Defendant] had a right to plead not guilty and have the guilt issue adjudicated by a jury of her peers and she chose not to. So this is a sentencing hearing. And the Court doesn't need the child or the father of the child to consider whether or not there's been an injury or an adverse affect on the child's health and welfare. That's crystal clear.
>
> And then there are the pictures. And there is the testimony of . . . Baugh and the statements in the record from the child or the reports from the child.
>
> Now, what this Court does is consider various factors in the sentencing guidelines. Let me just note some things. First of all, the Court finds that, it's very unfortunate, but the Court finds [that the Defendant] is not a truthful witness not at all, no cred[i]bility and that, therefore, hurts her cause significantly.
>
> This offense involved a nine-year-old child and, therefore, the victim of the offense was particularly vulnerable because of age in the Court's judgment.

Furthermore, [this] Court is of the opinion that this [D]efendant abused a position of private trust. In light of all the circumstances, the crime was committed under circumstances under which potential for bodily injury to a victim was great. Those are enhancement factors that the Court finds significant in this matter.

The Court has considered all the factors that the Court must consider when a request for judicial diversion has been made. The circumstances of this offense are great and outweigh other factors. But even if that weren't the case, the [D]efendant very unfortunately has just not been truthful and, therefore, the Court denies respectfully the request for judicial diversion in this matter.

. . . .

[The] Court is of the opinion that this is a very serious offense and that confinement is necessary to avoid depreciating the seriousness of the offense. And also especially confinement is particularly suited to provide an effective deterrent to others likely to commit similar offenses. Child abuse must stop in this county.

The Court is of the opinion that punishment advanced by the State is too lenient under all these circumstances. While the Court is not unsympathetic to the [D]efendant's age and physical health, a crime is a crime.

The trial court then sentenced the Defendant to serve eleven months and twenty-nine days in jail. Thereafter, the Defendant filed a timely appeal, contending that the trial court erred when it did not sentence her to probation.

## II. Analysis

The Defendant contends that the trial court erred because it failed to consider all the relevant factors when it denied her probation. Further, the Defendant asserts that the trial court abused its discretion when it denied her probation because it determined that she was untruthful. When a defendant challenges the length and manner of service of a sentence, it is the duty of this court to conduct a de novo review of the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ross, 49 S.W.3d 833, 847 (Tenn. 2001); State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999); State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court that are predicated upon uncontroverted facts. State v. Dean, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). In conducting a de novo review of a sentence, we must consider:

(a) any evidence received at the trial and/or sentencing hearing; (b) the presentence report; (c) the principles of sentencing; (d) the arguments of counsel relative to sentencing alternatives; (e) the nature and characteristics of the offense; (f) any mitigating or enhancement factors; (g) any statements made by the defendant on his or her own behalf; and (h) the defendant's potential or lack of potential for rehabilitation or treatment. See Tenn. Code Ann. § 40-35-210 (1997 & Supp. 2002); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging a sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2003), Sentencing Commission Cmts.

If our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and made findings of fact that are adequately supported by the record, then we may not modify the sentence, even if we would have preferred a different result. Sate v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the case under submission, the record demonstrates that the trial court properly considered relevant sentencing principles. Accordingly we apply the presumption that the trial court's sentencing determinations are correct. See Tenn. Code Ann. § 40-35-401(d).

In the case under submission, the Defendant was convicted of a class A misdemeanor. In misdemeanor sentencing, the sentence imposed must be specific and consistent with the purposes and principles of the Criminal Sentencing Reform Act of 1989. Tenn. Code Ann. § 40-35-302(b) (2003). A percentage of not greater than seventy-five percent of the sentence should be fixed for service, after which the Defendant becomes eligible for "work release, furlough, trusty status and related rehabilitative programs." Tenn. Code Ann. § 40-35-302(d). In the case under submission, the trial court set the Defendant's percentage for service at seventy-five percent.

The misdemeanant, unlike the felon, is not entitled to the presumption of a minimum sentence. State v. Creasy, 885 S.W.2d 829, 832 (Tenn. Crim. App. 1994). However, in determining the percentage of the sentence to be served in actual confinement, the trial court must consider enhancement and mitigating factors, as well as the purposes and principles of the Criminal Sentencing Reform Act of 1989, and the court should not impose such percentages arbitrarily. Tenn. Code Ann. § 40-35-302(d). Our Supreme Court has observed that "[i]n addition to the statutory considerations for issuing sentences of confinement, the misdemeanor sentencing statute merely requires a trial judge to consider enhancement and mitigating factors when calculating the percentage of a misdemeanor sentence to be served in confinement." State v. Troutman, 979 S.W.2d 271, 274 (Tenn. 1998).

A defendant is eligible for alternative sentencing if the sentence actually imposed is eight years or less. Tenn. Code Ann. § 40-35-303(a) (2003). In determining whether to grant or deny probation, the trial court may consider the following: the circumstances of the offense; the defendant's criminal record; background and social history; the defendant's physical and mental health; the deterrent effect on other criminal activity; and the likelihood that probation is in the best interests of both the public and the defendant. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim.

App. 1996). The Defendant bears the burden of establishing suitability for probation. Tenn. Code Ann. § 40-35-303(b); Ashby, 823 S.W.2d at 169. Sentences involving confinement should be based upon the following considerations:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103 (2003).

Further, in addition to consideration of the aforementioned factors, it is well established that "untruthfulness is a factor which may be considered in determining the appropriateness of probation." State v. Robert Duff and Vernita Cox, No. 02C01-9307-CR-00152, 1995 WL 390951, at *3 (Tenn. Crim. App., at Jackson, June 28, 1995), *perm. app. denied* (Tenn. Nov. 6, 1995) (citing State v. Neeley, 678 S.W.2d 48, 49 (Tenn. 1984); State v. Bunch, 646 S.W.2d 158, 160 (Tenn. 1983)); see also State v. Raymond K. McCrary, No. E2003-02368-CCA-R3-CD, 2004 WL 2085364, at *4 (Tenn. Crim. App., at Knoxville, Sept. 17, 2004), *no perm. app. filed*. In addition, "[a]lthough untruthfulness is not mentioned as a factor in Tenn. Code Ann. § 40-35-103(1), this [C]ourt has continued to declare it a relevant factor in determining the suitability of probation subsequent to the enactment of the 1989 Act." Id. (citing State v. Anderson, 857 S.W.2d 571, 574 (Tenn. Crim. App. 1992)).

In this case, in determining the Defendant's sentence, the trial court considered the Defendant's age and health, but concluded that the Defendant committed a very serious offense. The court found that three enhancement factors existed: (1) the victim of the offense was particularly vulnerable because of age; (2) the Defendant abused a position of private trust; and (3) the potential for bodily injury to a victim was great. Tenn. Code Ann. § 40-35-114 (5), (16), and (17). The court then denied the Defendant's subsequent request for a suspended sentence, or probation, based upon its findings that confinement is necessary to avoid depreciating the seriousness of the offense and to provide an effective deterrent to others likely to commit similar offenses. The court also determined that the Defendant had not been truthful, and that truthfulness is an important part of the probation process. Although this is the Defendant's first offense, the evidence does not preponderate against the trial court's finding that the evidence supports incarceration. The trial court determined that the Defendant was convicted of a very serious offense and, further, the Defendant was untruthful and unwilling to take full responsibility for her actions. There is no evidence in the record to preponderate against these findings. Therefore, we affirm the trial court's judgment.

### III. Conclusion

In accordance with the foregoing, we conclude that the trial court committed no reversible error in sentencing the Defendant.  Therefore, the judgment of the trial court is affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE